**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiffs, <br><br> v. <br><br> STATE OF NEW MEXICO and RAÚL TORREZ, in his official capacity as New Mexico Attorney General, <br><br> Defendants. | **Case No. 1:26-cv-01912-KG-JFR** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... iiii

INTRODUCTION ........................................................................................................................1

STATEMENT OF THE CASE...................................................................................................... 2

    I.   NEW MEXICO HAS LONG REGULATED GAMBLING, AND PROHIBITS UNDERAGE GAMING ........................................................................................ 2

    II.   KALSHI FACILITIATES ILLEGAL UNDERAGE SPORTS BETTING IN NEW MEXICO.................................................................................................................. 3

    III. FOLLOWING NEW MEXICO'S STATE COURT LAWSUIT AGAINST KALSHI, CFTC FILED THIS ACTION. ....................................................................................... 5

LEGAL STANDARD ................................................................................................................. 5

ARGUMENT ............................................................................................................................. 6

    I.   CFTC HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS. ........... 6

        A.   CFTC Lacks Article III Standing ...................................................................... 6

        B.   The CEA Does Not Preempt New Mexico's Longstanding Gambling Laws ................ 6

        i.   The Court Can Find No Preemption Even Assuming Arguendo That Sports "Event Contracts" Are "Swaps." .............................................................................. 7

        ii. Legal Standards: Presumption Against Preemption ........................................ 7

        iii. Congress' Purpose in Enacting the Commodities Exchange Act Was That CFTC Should Regulate Commodities, Not Sports Betting. ................................................ 8

            a.   The CEA does not expressly preempt New Mexico's sports betting laws. .......... 10

            b.   The CEA does not preempt the field of sports betting......................................... 12

            c.   New Mexico's sports betting laws are not conflict preempted by the CEA. ........ 14

            d.   CFTC's preemption theory violates the Major Question Doctrine....................... 17

C.    Sports Related Event Contracts Are Not Swaps Under The CEA................................ 18

    i.    CFTC's interpretation of swaps is inconsistent with Dodd-Frank's purpose. .............. 19

    ii.   Sports event contracts are not financial instruments used to hedge risk. .................... 19

    iii.  Sports event contracts are not "associated with a potential financial, economic, or
          commercial consequence."............................................................................... 20

    iv.   The CEA's special rule confirms sports event contracts are not swaps........................ 22

II.  CTFC HAS NOT ESTABLISHED IRREPARABLE HARM.......................................... 22

III. THE BALANCE OF THE HARM AND PUBLIC INTEREST FAVOR DEFENDANTS'
     ABILITY TO ENFORCE ITS GAMBLING LAWS....................................................... 23

CONCLUSION................................................................................................................ 24

## TABLE OF AUTHORITIES

CASES

*Alaska v. United States Department of Education,* 739 F.Supp.3d 873 (D. Kan. 2024)................17

*American Agric. Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147 (7th Cir. 1992) ..16

*Arizona v. United States,* 567 U.S. 387 (2012) ........................................................................7, 12

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)..............................................................8, 17

*Blue Valley Hosp., Inc. v. Azar*, 322 F. Supp. 3d 1149 (D. Kan. 2018).........................................6

*Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707 (10th Cir. 2024)..............................................17, 18

*Bradshaw v. American Airlines, Inc.*, 123 F.4th 1168 (10th Cir. 2024) .........................................7

*CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995) .......................................................9

*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742 10th Cir. 2010)..............................11

*Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015) ......................................................8

*Day v. SkyWest Airlines*, 45 F.4th 1181 (10th Cir. 2022) .........................................................8, 11

*Dirty Boyz Sanitation Serv., Inc. v. City of Rawlins,* 889 F.3d 1189 (10th Cir. 2018) ..................11

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018)............................................................................14

*Greater New Orleans Broad. Ass'n, Inc. v United States*, 527 U.S. 173 (1999) ............................8

*In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210 (10th Cir. 2020)......................................................................................................................15

*In re Winter Storm Uri Natural Gas Litigation*, 2026 WL 1944831 (10th Cir. 2026) .................13

*KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257, 2024 WL 4164694, (D.D.C. Sep. 12, 2024) ..........................................................................................................3

*KalshiEX LLC v. Cox,* No. 2:26-cv-00151-RJS-CMR (D. Utah Feb. 23, 2026) ...........................5

*KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).........................................................20

*KalshiEX, LLC v Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) ..................................... *passim*

*KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) ........................................... *passim*

*KalshiEX LLC v. Orgel*, No. 3:26-cv-00034 (M.D. Tenn.) ......................................................5, 20

*KalshiEX LLC v. Schuler*, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) ................................. *passim*

*KalshiEX LLC v. Schuler*, No. 2:25-cv-01165-SDM-CMV (S.D. Ohio) ...................................5, 21

*KalshiEX LLC v. Williams,* No. 1:25-cv-08846 (S.D.N.Y.) ...................................................7, 14, 24

*Kansas v. Garcia*, 589 U.S. 191 (2020) ...................................................................................12

*Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ...........................................6, 23

*Leachco, Inc. v. Consumer Prod. Safety Comm'n,* 103 F.4th 748 (10th Cir. 2024)  ..................5, 23

*Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007 (D.N.M. 2016) .........................................23

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)...........................................................10, 18

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ...................................................................................7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ..........................9, 12

*Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) .................................14, 18, 22

*N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025) ..............................................................................................18, 20

*Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373 (2015)........................................................................13

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234 (10th Cir. 2001)...........................22

*Pojoaque v. New Mexico*, 214 F. Supp. 3d 1028 (D.N.M. 2016)........................................7, 15, 16

*QCX LLC v. Nessel*, No. 1:26-CV-710, 2026 WL 1895958 (W.D. Mich. June 17, 2026)..... *passim*

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)....................................................................8

*Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93 (2012)...................................................................19

*Schrier v. Univ. Of Co.*, 427 F.3d 1253 (10th Cir. 2005)......................................................... *passim*

*State of New Mexico, ex rel., Raúl Torrez, Attorney General v. Kalshi, Inc. and KalshiEX LLC*, No. D-101-CV-2026-01567 (1st Jud. Dist. Ct.).....................................................................2

*State of New Mexico, ex rel., Raúl Torrez, Attorney General v. Kalshi, Inc. and KalshiEX LLC*,
No. 1:26-cv-01857-DHU-JFR (D.N.M.) ...............................................................2, 5

*Sw. Bell Wireless Inc. v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 199 F.3d 1185 (10th Cir. 1999) ...12

*Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222 (10th Cir. 2011) ...................................7, 8

*Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016 (10th Cir. 2022) ......................................................11

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025)........................................................................................24

*United States v. Commonwealth of Kentucky*, No. 3:26-cv-00049-SCM (E.D. Ky) .......................5

*United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025).....................................................................9

*W. Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) ...........................................................17, 21

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ..................................................................17

*Wyeth v. Levine*, 555 U.S. 555 (2009) ....................................................................... *passim*

**FEDERAL STATUTES**

7 U.S.C. § 1a(47)(A)................................................................................................ *passim*

7 U.S.C. § 2(a)(1)(A) ............................................................................................... *passim*

7 U.S.C. § 7a-2(c)(5)(C)(i) ....................................................................................... *passim*

7 U.S.C. § 16(e)(2)...........................................................................................................11, 13

7 U.S.C. § 16(h)(2) ..........................................................................................................11, 13

18 U.S.C. § 1084...................................................................................................................14

21 U.S.C. § 678......................................................................................................................11

25 U.S.C. §§ 2701...................................................................................................................3

25 U.S.C. § 2710...................................................................................................................14

49 U.S.C. § 14501(c)(1)..........................................................................................................11

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, July 21, 2010,
124 Stat 1376 .......................................................................................................................9

**STATE STATUTES**

NMSA 1978 § 30-19-2 ...............................................................................................................3

NMSA 1978 § 30-19-15(A) .......................................................................................................3

NMSA 1978 §§ 60-2E-1 to 62 ..................................................................................................2

NMSA 1978 § 60-2E-2(A) ........................................................................................................2

NMSA 1978 § 60-2E-3(O) .......................................................................................................3

NMSA 1978 § 60-2E-3(P) ........................................................................................................3

NMSA 1978, § 60-2E-34.1 .....................................................................................................24

NMSA 1978 § 60-2E-37 ......................................................................................................2, 24

NMSA 1978 § 60-2E 56(A). .....................................................................................................2

Compiled Laws of New Mexico, Tit. IX, Ch. 5, § 880 (1884) ................................................2

**LEGISLATIVE MATERIALS**

156 Cong. Rec. S5906-07 (July 15, 2010) ..............................................................................10

**FEDERAL REGULATIONS**

17 C.F.R. § 38.151 ...................................................................................................................15

17 C.F.R. § 40.11 .........................................................................................................10, 15, 16

73 Fed. Reg. 25669, 25670 (May 7, 2008) .............................................................................20

77 Fed. Reg. 48208, 48248 (Aug. 13, 2012) ...........................................................................20

89 Fed. Reg. 48,968, 48,982–83 (proposed June 10, 2024) ...................................................18

**INTRODUCTION**

The United States and Commodity Futures Trading Commission's (together, "Plaintiffs" or "CFTC") motion for preliminary injunction ("Motion") seeks to prevent New Mexico from prosecuting its lawsuit against unregulated sports betting. It should be denied for several reasons.

First, CFTC is unlikely to succeed on the merits of its claim (even if it possesses standing, *see* Defendants' Motion to Dismiss, ECF No. 23, at ¶¶ 9–12 ("Motion to Dismiss")). States, including New Mexico, have regulated gambling for over a century. CFTC's preemption theory rests on the Commodity Exchange Act's ("CEA") grant of "exclusive jurisdiction" over various financial instruments, including "swaps," that must be traded on CFTC-approved exchanges. 7 U.S.C. § 2(a)(1)(A). But the CEA's plain language and history, including its "savings clauses" and carve-outs, show that when Congress adopted Dodd-Frank reforms in 2010 to address the 2008 financial crisis, it did not intend to preempt longstanding state gambling laws, nor delegate CFTC authority to federally legalize sports betting nationwide or to declare that swaps include betting on the Denver Broncos to win on Sunday or score the first touchdown. And CFTC's new position violates both the presumption against Congressional preemption and the major question doctrine. "Congress did not displace historical state police powers over sports betting through Dodd-Frank and give it to a small federal regulatory agency with no expertise in gaming regulation."[1]

CFTC, not a party of interest in the State's lawsuit to enforce its gambling laws, cannot show imminent harm. The balance of the harms and public interest also support preserving the status quo, *i.e.*, New Mexico's ability to enforce gambling laws to protect the welfare of its citizens.

For the reasons discussed below, the Court should deny CFTC's motion.

---

[1] *KalshiEx, LLC v. Schuler, et al.*, No. 26-3196, ECF No. 55, at 27 (6th Cir., June 11, 2026) (Former CFTC Chairman Gary Gensler's Brief as Amicus Curiae In Support of Defendants-Appellees) ("Gensler Amicus").

**STATEMENT OF THE CASE**

**I.    NEW MEXICO HAS LONG REGULATED GAMBLING, AND PROHIBITS UNDERAGE GAMING**

Dating back to its territorial days, New Mexico has exercised its inherent police power to regulate gambling. *See*, *e.g.*, Compiled Laws of New Mexico, Tit. IX, Ch. 5, § 880 (1884) ("Crimes and Offenses — Punishments;" "Gaming and Vagrancy"). Since 1953, the New Mexico's Criminal Code has broadly prohibited all forms of gambling with only limited statutory exceptions. *State of New Mexico, ex rel., Raúl Torrez, Attorney General v. Kalshi, Inc. and KalshiEX LLC*, No. D-101-CV-2026-01567 (1st Jud. Dist. Ct.) ("State Action"), Compl. ¶¶ 86-91.[2] Under the Criminal Code both "gambling" (broadly defined to include activities such as "making a bet" and "conducting a lottery") and "commercial gambling" (including both "receiving, recording or forwarding bets or offers to bet" and "setting up for use, for the purpose of gambling, or collecting the proceeds of, any gambling device") are prohibited. *Id*.

Over time, the New Mexico legislature has enacted laws to legalize and regulate specific types of conduct that would otherwise fall under the Criminal Code's definition of gambling. In 1997, New Mexico passed the Gaming Control Act ("GCA"), NMSA 1978 §§ 60-2E-1 to 62, which permits limited, heavily regulated gaming under a robust licensing regime. The GCA also declares the State's policy on gaming that "limited gaming activities" should only be allowed "if those activities are strictly regulated to ensure honest and competitive gaming that is free from criminal and corruptive elements and influences." State Action Compl. ¶¶ 94, *citing* NMSA 1978 § 60-2E-2(A). New Mexico law does not allow betting, or gaming in any fashion by individuals under the age of 21.  *Id*. ¶¶ 11; 112-16, *citing* NMSA 1978 §§ 60-2E-37, 26(E), 56(A).

---

[2] Defendants request the Court take judicial notice of the State Action Complaint, attached as <u>Appendix A</u> to the Motion to Dismiss. *See* Motion to Dismiss at 1, n.1.

Sports betting both falls squarely within the Criminal Code's umbrella definition of gambling and meets the GCA's definition of "gaming" as an activity which, upon payment of consideration, an individual may receive something of value which is determined, in part, by chance. State Action Compl. ¶ 116. *citing* NMSA 1978 § 30-19-2, 60-2E-3(P), (O). New Mexico's Criminal Code separately prohibits facilitating sports gambling, forbidding the charging of a fee to "knowingly accept . . . anything of value from another to be transmitted or delivered for gambling or parimutuel [] wagering on the results of a race, sporting event, contest or other game of skill or chance[.]"[3]  *Id.*  ¶ 128, *citing* NMSA 1978 § 30-19-15(A).

## II.    KALSHI FACILITIATES ILLEGAL UNDERAGE SPORTS BETTING IN NEW MEXICO.

Since January 23, 2025, Kalshi has been offering sports betting under the guise of sports-related "event contracts.[4]" State Action Compl. ¶ 28. Kalshi is a self-described "prediction market" which operates as a CFTC-registered designated contract market ("DCM.")[5] In short, Kalshi's event contracts offer individuals a "Yes" or "No" position on whether a sports related event will occur—such as the Denver Broncos winning on Sunday—with the price of each position fluctuating between $0.01 and $0.99 depending on the number of other positions on an event. After the sporting event concludes, the winning position is paid out $1. State Action Compl. ¶¶ 36-40.

---

[3] The only sports betting that is permitted within the territorial boundaries of New Mexico occurs on tribal lands under individual compacts between the State and federally recognized Indian tribes and pueblos under the Indian Regulatory Gaming Act, 25 U.S.C. §§ 2701-2721 ("IGRA"), which is not at issue in CFTC's Complaint. *See* State Action Compl. ¶ 97 & n. 36.

[4] An event contract is a type of derivative contract "whose payoff is based on a specified event, occurrence, or value." *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. CV 23-3257, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024), *dismissed*, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025).

[5] Kalshi, *What is a Prediction Market?*, Kalshi News (Aug. 4, 2022) (describing how "[e]ach trader's **_bet_** helps shape the market consensus. . .offering up-to-date insights into public opinions and emerging trends.") (emphasis added), (Noferi Decl. Ex. 1:2).

3

While Kalshi initially offered event contracts on a limited number of topics including commodity-based economic events such the rates of inflation and the Consumer Price Index, following President Trump's inauguration Kalshi began offering event contracts tied to live sporting events on January 23, 2025.[6] State Action Compl. ¶ 26-28. In June 2026, Kalshi reported $31 billion was bet on its platform, with sports event contracts representing 85% of the total activity.[7] The sports-related event contracts listed by Kalshi include virtually every sporting event imaginable and mirror the most popular forms of traditional sports bets including moneyline, point spread, over/under, proposition, and parley bets. *Id*. ¶¶ 41-46. Moreover, Kalshi takes on the traditional role of a sportsbook by serving as a sophisticated counterpart sitting between individual bettors, setting terms, deciding outcomes of bets, paying the winner, and collecting a commission from each bet for its services. *Id.* ¶¶ 47-53. Despite young adults—particularly young men— engaging in harmful behavior related to sports betting at a disproportionally higher rate, Kalshi has made clear it will continue to offer its platform to anyone over 18 years of age *Id.* ¶¶ 80-84.

For its part, Kalshi has affirmatively advertised itself as providing legal "sports betting" in all 50 states. *Id.* ¶ 34.[8] A recent study showed that 85% of Americans agree with Kalshi that prediction markets' sports-related event contracts amount to gambling.[9] As for CFTC, its official 178-year history of commodities futures markets does not mention sports bets.[10]

---

[6] *See also* Sharon LaFraniere, *How Prediction Markets and Crypto Firms Steamrolled a Watchdog Agency*, NY Times (May 24, 2026), (Noferi Decl. Ex.2).

[7] CoinDesk, *Prediction markets just crushed traditional sportsbooks in a massive $50 billion World Cup breakout*. (July 14, 2026), (Noferi Decl. Ex.3).

[8] *See also* Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2024), (Noferi Decl. Ex. 4).

[9] American Gaming Association, Sports Event Contracts: Public Opinion Landscape, (Sept. 10, 2025), (Noferi Decl. Ex. 5).

[10] *History of the CFTC*, available at https://perma.cc/8VST-NSW4 (as accessed July 16, 2026).

### III.    FOLLOWING NEW MEXICO'S STATE COURT LAWSUIT AGAINST KALSHI, CFTC FILED THIS ACTION.

The State filed the State Action in New Mexico state court to enjoin Kalshi from facilitating illegal sports betting in New Mexico. *New Mexico v. Kalshi, Inc.*, No. D-101-CV-2026-01567 (N.M. 1st Jud. Dist. Ct. June 4, 2026).[11] Five business days later CFTC filed this case, which asks this Court to declare "New Mexico state laws violate the Supremacy Clause" and issue preliminary and permanent injunctions that prohibits New Mexico "from investigating for violations of, or enforcing, New Mexico state laws as applied to transactions listed, offered, or executed" on CFTC-regulated DCMs like Kalshi. ECF No. 1 at VII, ¶ A, B.[12] Kalshi currently operates in New Mexico.

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and it should not be issued unless the movant's "right to relief [is] clear and unequivocal." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005). The movant bears the burden of demonstrating:

> a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.

*Leachco, Inc. v. Consumer Prod. Safety Comm'n,* 103 F.4th 748, 752 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047, (2025).

---

[11] Kalshi subsequently removed the case to federal court, New Mexico moved to remand to state court, and that motion should be fully briefed by August 19, 2026. *State of New Mexico, ex rel., Raúl Torrez, Attorney General v. Kalshi, Inc. and KalshiEX LLC*, No. 1:26-cv-01857-DHU-JFR.

[12] As CFTC notes, CFTC has also sued Arizona, Connecticut, Illinois, Minnesota, New York, Wisconsin, Rhode Island and Kentucky, asserting federal preemption over state gambling laws. *See* ECF No. 1, at ¶ 61, listing; *United States v. Commonwealth of Kentucky*, No. 3:26-cv-00049-SCM (E.D. Ky. June 23, 2026). However, CFTC has not sued Utah, Ohio, and Tennessee, nor joined those suits despite DCMs suing those states. *See KalshiEX LLC v. Cox,* No. 2:26-cv-00151-RJS-CMR (D. Utah Feb. 23, 2026); *KalshiEX LLC v. Schuler*, No. 2:25-cv-01165-SDM-CMV (S.D. Ohio Oct. 7, 2025); *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034 (M.D. Tenn. Jan 9, 2026).

## ARGUMENT

### I.  CFTC HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS.

CFTC does not meet its high burden of unequivocally demonstrating it is likely to succeed on the merits. This is particularly true where, as here, the requested injunction would prohibit enforcement of duly enacted state statutes aimed at protecting the public's welfare because "democratically elected representatives . . . are in a better position than [courts] to determine the public interest[.]" *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir. 2003).

### A.  CFTC Lacks Article III Standing

Before the Court considers CFTC's request for injunctive relief, it should determine the threshold issue of jurisdiction. *Blue Valley Hosp., Inc. v. Azar*, 322 F. Supp. 3d 1149, 1159 (D. Kan. 2018), *aff'd*, 919 F.3d 1278 (10th Cir. 2019). CFTC is unlikely to succeed on the merits because it lacks Article III standing for the reasons explained in more detail in the State's motion to dismiss. *See* Motion to Dismiss at 7-16.

### B.  The CEA Does Not Preempt New Mexico's Longstanding Gambling Laws

CFTC does not show, let alone show a likelihood of success in arguing, that the CEA preempts New Mexico's gambling laws. CFTC's preemption theory rests on the CEA's grant of "exclusive jurisdiction" to CFTC over various financial instruments, including swaps, that must be traded on CFTC-approved exchanges. *See* 7 U.S.C. § 2(a)(1)(A). But the text and history of the CEA, including its various "savings clauses" and carve-outs, demonstrate that Congress did not intend CEA's exclusive jurisdiction over swaps to preempt longstanding state gaming laws, nor delegate CFTC authority to preempt those laws; nor that swaps, which Congress added to the CEA after the 2008 financial crisis, include sports betting (*i.e.*, event contracts based on every discrete outcome imaginable related virtually any live sporting events).

###### i. The Court Can Find No Preemption Even Assuming *Arguendo* That Sports "Event Contracts" Are "Swaps."

Initially, the Court can deny CFTC's motion based on lack of preemption without determining if sports related event contracts meet the CEA's definition of "swaps" ECF No. 13, at 12-14. Multiple federal courts have done so. *Schuler*, 2026 WL 1295806, at *3 (6th Cir. Apr. 24, 2026) (rejecting Kalshi's request to overturn the denial of a preliminary injunction without deciding the issue); *KalshiEX LLC v. Williams,* 2026 WL 2017466 at *11 (S.D.N.Y. July 7, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 675 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025). Conversely, CFTC must show event contracts qualify as swaps to demonstrate a likelihood of success. *Schuler*, 2026 WL 1295806, at *3.

###### ii. Legal Standards: Presumption Against Preemption

Preemption analysis begins with a presumption against preemption, rooted in federalism, which is heightened because CFTC asserts preemption over the State's historic police power to regulate gambling. "[A]ny preemption inquiry begins with the presumption that federal law does not override 'the historic police powers of the States,' without the 'clear and manifest' intent of Congress." *Bradshaw v. American Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (quoting *Arizona v. United States,* 567 U.S. 387, 400 (2012)); *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) (the analysis "starts with the basic assumption that Congress did not intend to displace state law."); *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011) (Court was "especially reluctant to find preemption in matters of longstanding state regulation").

"It is incontrovertible that New Mexico's regulation of gaming activities in the State is an exercise of the State's historic police powers" which "extends to all matters affecting the public health or the public morals[,]" and provides the State "great latitude" to legislate. *Pueblo of Pojoaque v. New Mexico*, 214 F. Supp. 3d 1028, 1098 (D.N.M. 2016), *aff'd*, 863 F.3d 1226 (10th

7

Cir. 2017); *see also Greater New Orleans Broad. Ass'n, Inc. v United States*, 527 U.S. 173, 187 (1999) ("That Congress has generally exempted state-run lotteries and casinos . . . reflects a decision to defer to, and even promote, differing gambling policies in different States.").

Under this applicable presumption, CFTC must identify "clear and manifest" language in the CEA demonstrating Congress' preemptive intent. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). But when a statute "is susceptible to more than one reading," courts have a "duty. . . to accept the reading that disfavors pre-emption." *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1094 (10th Cir. 2015) (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 499 (2005)).

### iii. Congress' Purpose in Enacting the Commodities Exchange Act Was That CFTC Should Regulate Commodities, Not Sports Betting.

Under all three of CFTC's preemption arguments—express, field, and conflict preemption—the analysis focuses on the purpose of Congress in enacting the CEA and its Dodd-Frank amendments. *Tarrant*, 656 F.3d at 1241 ("In determining whether a state statute is preempted, the purpose of Congress is the ultimate touchstone.") (citation modified); *Day v. SkyWest Airlines*, 45 F.4th 1181, 1187 (10th Cir. 2022) (looking to federal statute's purpose and history to determine if Congress had a "clear and manifest purpose" to preempt the challenged state law). The purpose and history of the CEA shows that Congress created CFTC to regulate commodities; that Congress thought little about sports betting; and to the extent Congress did consider it, Congress provided CFTC with authority to disallow sports betting from its regulated exchanges, not to legalize sports betting and preempt every state law prohibiting or regulating it.[13]

---

[13] Indeed, a former CFTC Chair details the history of the CEA, the unlikelihood that Congress would have preempted every state gambling law at a time when sports gambling was prohibited in most states, and specifically, the unlikelihood that Senate Majority Leader Harry Reid (D-Nev) would have enacted such a law, having chaired Nevada's Gaming Control Board. *See generally* Gensler Amicus at, *e.g.*, 3, 13-15.

8

Congress enacted the CEA in 1936 to regulate agricultural commodities and futures contracts to buy or sell agricultural commodities on a future date. Pub. L. No. 74-675, § 3, 49 Stat. 1491, 1491 (1936); *see CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). In 1974, Congress amended the CEA by expanding it to virtually all commodities and other financial derivatives and creating CFTC to replace the Secretary of Agriculture as the entity responsible for registering DCMs engaged in trading subject to the CEA. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (1974). To avoid regulatory overlap in these emerging markets, Congress granted CFTC the "exclusive jurisdiction" over futures contracts and derivatives traded on DCMs or other markets. 7 U.S.C. § 2(a)(1)(A). Importantly, this grant of "exclusive jurisdiction" had nothing to do with the preemption of state law. *QCX LLC v. Nessel*, 2026 WL 1895958 at *10 (W.D. Mich. June 17, 2026) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982)). Rather it was "intended only to consolidate federal regulation of commodity futures trading in the [CFTC]" and to "separate the functions of the [CFTC] from those of the Securities and Exchange Commission and other regulatory agencies." *Id*.

In response to the 2008 financial crisis, Congress enacted the Dodd-Frank amendments to the CEA with the purpose to "promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to protect the American taxpayer by ending bailouts, [and] to protect consumers from abusive financial services practices[.]" Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, pmbl., 124 Stat. 1376 (2010) ("Dodd-Frank"). Dodd-Frank sought to achieve those purposes by, *inter alia*, amending the CEA to include swaps among the other financial instruments under CFTC's exclusive jurisdiction. *Id*. at 1672. Credit default swaps had played a pivotal role in fueling the financial crisis. *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025).

9

Dodd-Frank also provided CFTC regulatory authority to disallow from its exchanges, on public policy grounds, certain kinds of financial instruments known as event contracts. 7 U.S.C. § 7a-2(c)(5)(C)(i). The "Special Rule" states CFTC "may" determine that certain "agreements, contracts, transactions, **or** swaps[,]" that could be classified as event contracts are "contrary to the public interest[,]" and disallowed from CFTC regulated exchanges, if they involve one of five categories including, in relevant part, "gaming" and "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added).[14] The next year, CFTC adopted an event contract specific regulation, 17 C.F.R. § 40.11, which established that DCMs were prohibited from listing event contracts involving or relating to "gaming, or an activity that is unlawful under any State or Federal law[.]" *Id*.  That rule remains in force today.[15]

Notably, the only mention of sports betting in Dodd-Frank's legislative history makes clear Congress did <u>not</u> want sports betting to occur on DCMs. *See* 156 Cong. Rec. S5906-07 (July 15, 2010) (colloquy between Senators Feinstein and Lincoln explaining "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" but "[t]hese types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.").

### a.  The CEA does not expressly preempt New Mexico's sports betting laws.

---

[14] Importantly, the Special Rule's application to all event contracts whether they are "agreements, contracts, transactions, **or** swaps" indicates Congress understood certain types of event contracts were not "swaps" that fall under CFTC's exclusive jurisdiction. *See* Section I(C)(iv), *infra*.

[15] CFTC notably fails to discuss the current 17 C.F.R. § 40.11 which prohibits "gaming" event contracts on DCMs. However, CFTC does reference its recent efforts to amend Rule 40.11, see ECF No. 13 at 19-20. The Court should disregard this reference as any proposed rule is not in effect.  Moreover, courts do not defer to agency rulemaking. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400-01 (2024) (holding "agencies have no special competence in resolving statutory ambiguities," especially when it comes to "the scope of an agency's own power").

10

No court has found the CEA expressly preempts sports betting laws. *See, e.g.*, *Nessel*, 2026 WL 1895958, at *10; *Schuler*, 2026 WL 1295806, at *4.  Express preemption applies when Congress "defines explicitly the extent to which its enactments pre-empt state law." *Day*, 45 F.4th at 1184 (citation omitted). To determine whether a state law is expressly preempted, courts "apply ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010).

CFTC's express preemption argument is based on its "exclusive jurisdiction" over "transactions involving swaps" that are "traded . . . on a [designated] contract market[.]" 7 U.S.C. § 2(a)(1)(A); (ECF 13 at 23, 26). But Section 2(a)(1)(A)'s use of "exclusive" would be an "unusual express-preemption provision," as Congress usually "uses words like 'preempt' or 'supersede'" when indicating an intent to expressly preempt state laws. *Schuler*, 2026 WL 1295806, at *4; *see also Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1020 (10th Cir. 2022) (21 U.S.C. § 678, "may not be imposed by any State"); *Dirty Boyz Sanitation Serv., Inc. v. City of Rawlins,* 889 F.3d 1189, 1198 (10th Cir. 2018) (49 U.S.C. § 14501(c)(1), "States may not enact or enforce a law").

CFTC's arguments are also undercut by Congress' choice of express preemption provisions elsewhere in the CEA. For example, Congress chose to expressly preempt state gaming laws in certain situations, but not as to swaps. *Schuler*, 2026 WL 1295806, at *4 (citing 7 U.S.C. § 16(e)(2) (The CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops" in two situations not applicable here.)). Conversely, Congress chose to preempt state insurance laws as applied to swaps, but not State gaming laws.  *Id*., citing 7 U.S.C. § 16(h)(2) ("States may not 'regulate[ ]' a 'swap' 'as an insurance contract' under their [] laws."). Those provisions confirm Congress intended to enact express-preemption provisions in the CEA, and Congress did not do so regarding state gaming laws except

11

for limited circumstances not relevant here, and specifically not for swaps. *Id*. ("Congress's choice to expressly preempt *only* certain categories of state laws shows that it did not mean to 'withdraw' the States' power to enact all such laws in other circumstances." (citing *Arizona*, 567 U.S. at 399)).

CFTC's express preemption argument is also contradicted by Section 2(a)(1)(A)'s two savings clauses. The first savings clause provides that "[e]xcept as hereinabove provided, nothing contained in this section shall [] supersede or limit the jurisdiction at any time conferred" on "regulatory authorities under the laws of [] any State." 7 U.S.C. § 2(a)(1)(A).  The second savings clause states that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id*. These clauses indicate Congress intended to preserve, not eliminate, state regulatory power, particularly in areas against the public interest like gaming (in some states). See *Schuler*, 2026 WL 1295806, at *4-5; *Nessel*, 2026 WL 1895958 at *10.

Section 2(a)(1)(A) was not intended as a preemption provision, but as a provision to avoid duplicative *federal* regulation which Congress enacted "only to consolidate federal regulation . . . in the Commission" and "separate the functions" of CFTC from other federal agencies. *See Nessel*, 2026 WL 1895958 at *10 (citing *Merrill Lynch*, 456 U.S. at 386–87).  Put another way, Section 2(a)(1)(A) "identifies the governing *agency* (the CFTC rather than the SEC or a state regulator), not the governing *law* (whether federal or state)"). *Schuler*, 2026 WL 1295806, at *4.

### b.  The CEA does not preempt the field of sports betting.

Field preemption is "rare," and applies only where "Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quotation omitted). Examples of field preemption include immigration, *see id.*, and Federal Communications Commission regulation of radio frequencies, *Sw. Bell Wireless Inc. v. Johnson Cnty. Bd. of Cnty. Comm'rs*, 199 F.3d 1185, 1193

(10th Cir. 1999). In performing a field preemption inquiry, the threshold inquiry is identifying "the *target* at which the state law *aims* in determining whether that law is pre-empted." *In re Winter Storm Uri Natural Gas Litigation*, 2026 WL 1944831, at \*6 (10th Cir. 2026) (citing *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015)). Here, CFTC cites New Mexico's State Action targeting unlawful sports gambling.[16] The CEA does not comprehensively regulate sports betting in a manner that leaves no room for New Mexico's involvement.

As with express preemption, the CEA itself undercuts field preemption through its numerous provisions that permit state regulation. *Schuler*, 2026 WL 1295806, at \*5; *see also Martin*, 793 F. Supp. 3d at 680–82 ("[T]he fact that the CEA has some field-preempted effect does not mean that the 'field' Congress intended for the CEA to occupy includes state gambling laws and specifically sports wagering laws."); *Nessel*, 2026 WL 1895958, at \*11 ("The statutory framework thus relies on the existence of state law and leaves room for states to enforce both the statute itself and state laws in the same field.").

As noted directly above, Congress chose express preemption provisions elsewhere in the CEA but did not do so regarding state gaming laws except for limited circumstances not relevant here.  Specifically, Sections 16(e)(2) and 16(h)(2) provide "strong evidence that Congress did not intend to regulate so comprehensively as to exclude all state law." *Martin*, 793 F. Supp. at 681. Federal courts have thus concluded that the target of the relevant state law is sports betting, and that Congress did not intend to field preempt those state laws. *See Martin,* 793 F. Supp. 3d at 680 ("Congress directly considered the scope of the field it considered itself to be occupying for preemption purposes when it comes to 'gaming.'"); *Schuler*, 2026 WL 1295806, at \*4 (Congress

---

[16] While CFTC raises the specter that "New Mexico has thus far specifically targeted only sports event contracts," ECF No. 13 at 2, the State's lawsuit clearly aims to enjoin only sports-related event contracts. *See* State Action Compl., Prayer for Relief.

would not have needed to provide for preemption of state law in those circumstances if it had already preempted all state regulation through the "exclusive jurisdiction" provision.).

CFTC's field preemption argument also fails when considering other federal statutes which touch on the field of sports betting and defer to state regulation. For example, IGRA grants Indian tribes the right to conduct certain gaming operations but only to the extent the state the tribe is in "permits such gaming." 25 U.S.C. § 2710(b)(1)(A), (d)(1)(B). The Wire Act, 18 U.S.C. § 1084, similarly criminalizes the use of a "wire communication facility" to transmit "bets or wagers on any sporting event or contest" but only to the extent sports betting is illegal under state law. 18 U.S.C. § 1084(a)-(b). Through these statutes, Congress has enshrined a clear deference to state legislatures to choose whether to regulate or ban sports betting in their jurisdictions. *See Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 484, 486 (2018). Because CFTC's interpretation of the CEA requires a finding that Congress impliedly repealed other federal laws, it should be rejected. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

Both the Special Rule and the CEA's savings clauses further undercut CFTC's field preemption argument. Rather than demonstrating Congress' intent to consolidate the field of sports betting solely under CFTC's purview, the Special Rule's allowance for public interest exclusions based on gaming and state prohibitions shows that Congress intended state laws to operate in tandem with the CEA. *See Schuler*, 2026 WL 1295806, at *6; *Williams*, 2026 WL 2017466 at *13–14; *Martin*, 793 F. Supp. 3d at 680.  And as noted above regarding express preemption, Section 2(a)(1)(A)'s two savings clauses also contradict CFTC's field preemption argument. *See Martin*, 793 F. Supp. 3d at 682 ("[a] savings clause generally negates the inference that Congress left no room for state causes of action.") (citation omitted).

**c.  New Mexico's sports betting laws are not conflict preempted by the CEA.**

14

Implied conflict preemption occurs only when "compliance with both federal and state regulations is a physical impossibility," or where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress[.]" *Pueblo of Pojoaque*, F. Supp. 3d at 1070 (citation omitted). CFTC demonstrates neither here.

Impossibility preemption is a "demanding" defense and the movant bears the burden to demonstrate its applicability. *In re MDL 2700 Genentech Herceptin (Trastuzumab) Mktg. & Sales Prac. Litig.*, 960 F.3d 1210, 1235 (10th Cir. 2020) (citing *Wyeth v. Levine*, 555 U.S. 555, 573 (2009)). CFTC's only "impossibility" argument hinges on a self-admitted hypothetical conflict with the so-called "impartial access" rule in 17 C.F.R. § 38.151, which CFTC argues could theoretically result in DCMs being "forced to discriminate against New Mexicoers [sic]." ECF No. 13 at 20. Despite CFTC's feigned concern for New Mexicans, this argument fails.

The impartial-access rule is understood as an "anti-discrimination command," not a "limit on a facially neutral requirement" like a state's regulation of sports betting. *Schuler,* 2026 WL 1295806, at *6. The rule ensures fair treatment of DCM participants, not a compulsory obligation for DCMs to facilitate sports betting in all 50 states. *Id.* (finding 17 C.F.R. § 38.151 requires "'impartial' 'access' to whatever 'market(s)" a DCM offers but does not require a DCM "to offer any 'particular market' for its event contracts."). Indeed, CFTC argues that 17 C.F.R. § 38.151 requires DCMs to offer sports betting nationwide while 17 C.F.R. § 40.11(a)(1) bans event contracts involving "gaming" or "an activity that is unlawful under any State or Federal law."

Even assuming sports event contracts are not prohibited, Congress enacted a floor, but not a ceiling, leaving room for state gambling laws such as New Mexico's. *See Wyeth*, 555 U.S. 555, 566-67 (Supreme Court rejected that the Food, Drug, and Cosmetic Act set "both a floor and a ceiling" and held the law did not preempt state laws that went beyond the requirements imposed

15

by the relevant federal agency). As in *Wyeth*, the CEA requires DCMs like Kalshi to meet baseline requirements before offering financial instruments to the public, like the self-certification process required by 7 U.S.C. § 7a–2(c)(1). But Congress "indicated its awareness of the operation of state law" in relation to event contracts that constitute gaming, *Wyeth,* 555 U.S. at 575 (citation omitted), and the CEA clearly contemplates stricter state standards for those instruments through the Special Rule's incorporation of state law, the CEA's savings clauses' retention of state regulatory and judicial authority, and the limited express preemption clauses discussed above. *Nessel*, 2026 WL 1895958, at \*11 ("The statutory framework thus relies on the existence of state law and leaves room for states to enforce both the statute itself and state laws in the same field.")

New Mexico's gambling laws similarly do not frustrate the "full purposes and objectives of Congress" in enacting the CEA. The Supreme Court has "begun to back away" from implied obstacle preemption based on an alleged conflict with the general purpose of a federal statute. *Pueblo of Pojoaque*, 214 F. Supp. 3d at 1072-1073 (citing *Wyeth,* 555 U.S. at 581). Both CFTC's concern regarding market efficiency and that excluding sports-related event contracts from swaps would "imperil[]" its jurisdiction over other event contracts, ECF No. 13 at 13, 21, fall flat because 17 C.F.R. § 40.11(a)(1), enacted at a time when CFTC conceded state gambling laws regulated sports betting, prohibits sports event contracts from being lawfully listed or traded on a DCM.

The only legal authority CFTC cites to support implied conflict preemption under the CEA's exclusive-jurisdiction provision, *American Agric. Movement, Inc. v. Board of Trade of Chicago*, is inapposite. First, the financial instrument at issue in that case was an agricultural commodity derivative involving soybean futures that fell squarely within the CEA's historic purpose. 977 F.2d 1147, 1150 (7th Cir. 1992). Moreover, federal courts considering the CEA's preemption of sports gambling have distinguished *American Agric.* as cabining Congress'

16

preemptive intent and preserving some state law causes of action, which did not show conflict preemption. *Martin,* 793 F. Supp. 3d at 682 (Congress "did not manifest an intent to occupy completely the entire field of commodity futures regulation."), 684 n.5; *Schuler,* 2026 WL 1295806, at *6 (dismissing Kalshi's almost identical arguments as "generic uniformity concerns").

For these reasons, CFTC cannot overcome the presumption against preemption and has not shown a clear and manifest purpose from Congress for the CEA to preempt New Mexico gambling laws. At most, CFTC's arguments present a second plausible interpretation of the CEA, and the Court has "a duty to accept the reading that disfavors pre-emption." *Bates,* 544 U.S. at 449.

### d.   CFTC's preemption theory violates the Major Question Doctrine.

The major question doctrine bolsters the arguments against CEA preemption and separately provides this Court with authority to deny CFTC's preliminary injunction.  *See Alaska v. United States Dep't of Educ.*, 739 F. Supp. 3d 873, 883, 889 (D. Kan. 2024). The doctrine dictates that "[e]xtraordinary grants of regulatory authority" in areas of economic and political significance are "rarely accomplished through modest words, vague terms, or subtle device[s]." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721, 722–23 (2022) (citation modified). Instead, such authority requires "clear congressional authorization." *Id.* at 722. Put more bluntly, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

CFTC's newly asserted preemption authority meets all four Tenth Circuit factors for major question doctrine application. *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 726 (10th Cir. 2024). First, CFTC bases their "expansive authority in modest words, vague terms or ancillary provisions" *Id*. at 726. The disjointed connection of CFTC's "exclusive" jurisdiction over "swaps" and its authority to prohibit event contracts involving "gaming" and other "unlawful state law" activities from its exchanges does not authorize it to ***legalize*** sports betting nationwide ***and preempt*** every

17

state law related to sports betting, a multi-billion dollar a year industry which "Americans have never been of one mind about[.]" *Murphy*, 584 U.S. at 458. Second, in so proposing, CFTC seeks an "enormous and transformative expansion" in its authority "without clear congressional authorization." *Bradford*, 101 F.4th at 726. Third, CFTC does so by claiming to discover this new authority for the first time "in a long-extant statute." *Id*. Fourth, CFTC "lacks 'expertise' in the relevant area of policymaking," *id*. at 728, as the agency acknowledged in prior rulemaking.[17]

## C. Sports Related Event Contracts Are Not Swaps Under The CEA

CFTC's preemption argument independently fails because event contracts that facilitate sports betting are not swaps subject to 7 U.S.C. § 2(a)(1)(A). *See KalshiEX, LLC v Hendrick*, 817 F. Supp. 3d 1014, 1029 (D. Nev., 2025) (Kalshi's sports event contracts "are sports wagers and everyone who sees them knows it."), *appeal docketed*, No. 25-7516 (9th Cir Nov. 28, 2025).

Here, CFTC argues that sports-related event contracts meet Part (ii) of the CEA's definition: an agreement, contract, or transaction "that provides any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence[.]" 7 U.S.C. § 1a(47)(A)(ii). This interpretation of swaps is not entitled deference because "the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap." *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180-81; (D. Nev. 2025) ("*Crypto*") *appeal docketed*, No. 25-7187 (9th Cir. Nov. 14, 2025) (discussing *Loper Bright*, 603 U.S. at 194, 402 (2024)). Instead, the CEA must be interpreted against the presumption against preemption and major questions doctrine. *Id.* at 1185-86, 1189.

---

[17] Event Contracts, 89 Fed. Reg. 48,968, 48,982–83 (proposed June 10, 2024) ("[I]n the United States, gambling is overseen by state regulators . . . and governed by state gambling laws aimed at addressing particular risks and concerns associated with gambling[.]")

### i. CFTC's interpretation of swaps is inconsistent with Dodd-Frank's purpose.

Due to the role unregulated credit default swaps played in the 2008 financial crisis, Congress' purpose in adding swaps under the CEA was "bringing these risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector," not "enabling nationwide gambling on CFTC-designated exchanges." *Hendrick*, 817 F. Supp. 3d at 1031. Dodd-Frank did not federalize sports betting because it played no role in the crisis.

CFTC ignores the critical, on-point legislative history discussed in Section I(B)(iii) demonstrating Congress' intent to exclude sports betting from the reaches of the CEA in favor of two passages from legislators in 1974, more than two decades before Dodd-Frank added swaps to the CEA. ECF No. 13 at 27. But the contemporary legislative history and CFTC's actions since Dodd-Frank are the relevant context. Neither supports CFTC's new interpretation of swap, which assumes that Congress intended to displace historical state police powers over sports betting through Dodd-Frank and give it to a niche federal regulatory agency with no gambling experience.

### ii. Sports event contracts are not financial instruments used to hedge risk.

The CEA's definition of "swaps" contains six parts, and because courts read "the words of a statute . . . in their context and with a view to their place in the overall statutory scheme," Part (ii), upon which CFTC relies, must be read in the context of its neighboring definitions. 7 U.S.C. § 1a(47)(A); *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). Parts (i) and (iii), the clauses bookending Part (ii), define swaps as agreements that directly relate to "interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property[,]" with Part (iii) further listing 22 specific swaps that transfer "financial risk" between the parties to the transaction. 7 U.S.C. § 1a(47)(A). Part (iv) broadly covers any agreement "that is or in the future becomes, commonly

19

known to the trade as a swap" and Part (v) covers "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security." *Id*. Finally, Part (vi) covers any contract "that is any combination or permutation" of contracts in the other parts. *Id*. Read holistically, the six subparts of 7 U.S.C. § 1a(47)(A) collectively establish that "swaps" are financial instruments used to hedge risk, like the credit default swaps that fueled the financial crisis and were the reason these provisions were added. *Hendrick*, 817 F. Supp. 3d at 1031.

Underlying this textual conclusion is CFTC's recognition that event contracts are not suited to the CEA's central purposes of regulating financial instruments aimed at hedging risk or price discovery, finding they "generally take the form of financial agreements linked to eventualities or measures that neither derive from, nor correlate with, market prices or broad economic or commercial measures." 73 Fed. Reg. 25669, 25670 (May 7, 2008). This is particularly true for sports-related event contracts, which do "not involve risk-shifting arrangements with financial entities[,]" a key component of a swap. 77 Fed. Reg. 48208, 48247-48 (Aug. 13, 2012). Instead, sports-related event contracts are generally consumer transactions (*i.e.*, bets) that create, not hedge, risk as a form of entertainment. *See Hendrick*, 817 F. Supp. 3d at 1029 (discussing event contracts for "discrete moments or acts during a sports game like a coin flip or whether there is a fumble").

### iii. Sports event contracts are not "associated with a potential financial, economic, or commercial consequence."

To meet Part (ii)'s definition, sports-related event contracts must also be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).[18] Event

---

[18] Federal courts have also found that sports event contracts are not swaps because they do not meet the "occurrence, nonoccurrence, or the extent of the occurrence of an event" requirement of Section 1a(47)(A)(ii). *Hendrick*, 817 F. Supp. 3d at 1026–28; *Crypto*, 815 F. Supp. 3d at 1181–84; *Nessel*, 2026 WL 1895958 at *2-3; *see also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 233 (3d Cir. 2026*)* (Roth, J., dissenting) (declining to decide the issue but emphasizing that taking the definition "to its logical extreme" would be "rationality-defying" and "radically upend the legal landscape governing the gambling industry"); *but see KalshiEX LLC v. Orgel*, No. 3:26-cv-

contracts based on live sports events do not meet this textual requirement. The sports-related event contracts targeted by New Mexico hinge on sporting contests and discrete outcomes within sporting events, not financial instruments like interest rates, commodity prices, or foreign exchange rates.  Bets on the Denver Broncos to win or score a touchdown first are not swaps. See *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at \*5-6 (S.D. Ohio March 9, 2026), *appeal docketed*, No. 26-3196 (6th Cir. March 11, 2026).

CFTC's position is that because every sporting event can have some degree of downstream economic consequence, every event contract related to a sporting event qualifies as a swap. But this argument "knows no limiting principle." *Hendrick*, 817 F. Supp. 3d at 1027.  Instead, Part (ii)'s "associated with potential economic consequences" qualifier must be read as encompassing only events that are "inherently joined or connected with" economic consequences "without looking at externalities like potential downstream financial consequences." *Id.*

Additionally, if CFTC is correct that all sports adjacent event contracts are swaps merely because some type of financial consequence can be attributed to them no matter how attenuated in causation or time, "then all contracts for payment based on the outcome of a sporting event—all sports bets—would be forced onto [prediction markets]." *Schuler*, 2026 WL 657004, at \*6. This is because except in limited circumstances, Section 2(e) makes it "unlawful" to "enter into a swap" outside of a DCM. 7 U.S.C. § 2(e). This sweeping reading would give CFTC unchecked authority over any type of gambling dressed up as an event contract, an "unheralded power" that CFTC has never previously claimed. *W. Virginia,* 597 U.S. at 721; *see also Biden v. Nebraska,* 600 U.S. 477,

---

000342026 WL 474869, at \*7 (M.D. Tenn. Feb. 19, 2026), *appeal docketed*, No. 26-5235 (6th Cir. March 23, 2026). Defendants' briefing focuses on the "commercial consequence" portion of Section 1a(47)(A)(ii) but submit that the sports event contracts at issue meet no part of Part (ii)'s definition.

501 (2023). It would also federally legalize sports betting, taking away the "important policy choice" states have made regarding sports gambling, *Murphy*, 584 U.S. at 486, including states like Utah who have strictly prohibited any and all gambling within its jurisdiction.

### iv.   The CEA's special rule confirms sports event contracts are not swaps.

CFTC argument that the CEA's Special Rule somehow "underscores" the position that sports-related event contracts are swaps under the CEA, ECF No. 13 at 22, is at best disingenuous. As explained, the Special Rule permits CFTC to "determine that . . . agreements, contracts, transactions, **or** swaps are contrary to the public interest if [they] involve" one of five discrete categories, including "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). The Special Rule certainly did not define event contracts involving one of these prohibited activities exclusively as swaps, and in fact distinguishes the two as different. 7 U.S.C. § 7a-2(c)(5)(C); *Nessel*, 2026 WL 1895958 at *7 (discussing the "full title of the Special Rule").  By text and design the Special Rule makes clear that while some event contracts *may* meet the CEA's definition swaps, others are merely "agreements, contracts, or transactions." *Id*. By broadly addressing all event contracts, whether swaps or not, the Special Rule's public interest focus extends beyond the delineated list financial instruments subject to CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A).

## II.   CTFC HAS NOT ESTABLISHED IRREPARABLE HARM

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier*, 427 F.3d at 1267 (citation omitted). "[M]erely serious or substantial" harm is not irreparable harm. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quotation omitted). Courts have linked the "irreparable injury" inquiry to the "likelihood of success" inquiry and held that a movant who cannot demonstrate a substantial likelihood of

22

success is not entitled to a presumption of irreparable harm. *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016) (citing *Schier*, 427 F.3d at 1266).

Because CFTC has failed to show a likelihood of success, its irreparable harm argument fails with it.  Moreover, because CFTC has failed to allege an injury supporting Article III standing, see Motion to Dismiss, at 7-12, it has also not demonstrated irreparable harm, which carries a higher burden of demonstrating "a clear and present need for equitable relief to prevent" the harm. *Schrier*, 427 F.3d at 1267 (citations omitted). New Mexico is not seeking to regulate CFTC, and CFTC does not sufficiently explain how New Mexico's enforcement of its state gambling laws irreparably harms the agency. To the extent CFTC argues that DCMs like Kalshi face irreparable harm, Kalshi continues to operate in New Mexico. Even if the State won its lawsuit against Kalshi, CFTC does not present argument or evidence that New Mexico enforcing its longstanding gambling laws will have an irreparable effect "making it difficult or impossible" for DCMs "to resume their activities" if CFTC prevails. *See Heideman*, 348 F.3d at 1189.

## III. THE BALANCE OF THE HARM AND PUBLIC INTEREST FAVOR DEFENDANTS' ABILITY TO ENFORCE ITS GAMBLING LAWS

CFTC's cursory argument addressing the public interest factor "falls apart if the state laws are not in violation of the Supremacy Clause," so the agency's "public interest arguments are only as persuasive as its arguments on the likelihood of success on the merits." *Nessel*, No. 1:26-CV-710, 2026 WL 1166362 (W.D. Mich. Mar. 10, 2026) (denying DCMs request for TRO).

Moreover, CFTC's analysis ignores the last preliminary injunction factor of whether its alleged injury "outweighs the harm that the preliminary injunction may cause the opposing party[,]" here, New Mexico and its Attorney General. *Leachco*, 103 F.4th at 752.  The Attorney General is statutorily charged with enforcing New Mexico's gambling laws aimed at protecting the welfare and safety of New Mexicans by ensuring responsible gaming, age verification, and

providing assistance with gambling addiction. For example, New Mexico law strictly prohibits anyone under 21 from gaming. NMSA 1978, § 60-2E-37. In contrast, Kalshi allows anyone over 18 to bet on its platform. New Mexico law also establishes a statewide self-exclusion program aimed at curbing gambling addiction which each licensed gaming operator must participate in. NMSA 1978, § 60-2E-34.1. "[N]either DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators and licensed entities are." *Hendrick*, 817 F. Supp. 3d at 1036.

Preventing Defendants from enforcing duly enacted state laws aimed at the welfare and safety of New Mexico citizens is a direct attack on New Mexico's sovereign police power and inflicts an irreparable injury on the State and the public. *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *see also Williams*, 2026 WL 2017466, at *11 (holding New York's interests in regulating gambling "heavily outweigh" any interest in allowing Kalshi to continue offering sports-related event contracts).

The status quo for over a century in this country has been state regulation of all types of gambling to protect the health and safety of their citizens. CFTC seeks to alter this status quo by preempting New Mexico's ability to exercise its historic police power over gambling. CFTC thus asks for a specifically disfavored preliminary injunction which is subject to "heightened" scrutiny. *Schrier*, 427 F.3d at 1258-59. Both the public interest in maintaining the status quo and the balance of harms if the status quo is disrupted weigh heavily in Defendants' favor.

## CONCLUSION

For the foregoing reasons, Defendants request this Court deny Plaintiffs' motion for a preliminary injunction.

24

Dated: July 16, 2026

Respectfully Submitted,

**RAÚL TORREZ**
**ATTORNEY GENERAL OF NEW MEXICO**

By: ___/s/Mark Noferi_____

Mark Noferi
Senior Litigation Counsel
Olivia den Dulk
Assistant Attorney General
Impact Litigation Division
**NEW MEXICO DEPARTMENT OF JUSTICE**
408 Galisteo Street
Santa Fe, NM 87501
(505) 640-2891
mnoferi@nmdoj.gov
odendulk@nmdoj.gov

**KEEGAN RICHARDSON SOLIMON & WEST LLP**
Justin J. Solimon
Kelli J. Keegan
Jesse D. Heibel
Kayla J. Jankowski
7424 4th Street NW
Los Ranchos de Albuquerque, NM 87107
(505) 842-6124
jsolimon@indiancountrylaw.com
kkeegan@indiancountrylaw.com
jheibel@indiancountrylaw.com
kjankowski@indiancountrylaw.com

*Counsel for Defendants New Mexico and Attorney General Raúl Torrez*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2026, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.


_/s/Mark Noferi_____
Mark Noferi